**In re VOLPE ENTERPRISES, INC., Debtor.**

**MIDAS INTERNATIONAL CORP., Plaintiff.**

v.

**VOLPE ENTERPRISES, INC., Defendant.**

**Bankruptcy No. 82–00628–BKC–JAG.**
**Adv. No. 82–0359–BKC–JAG–A.**

United States Bankruptcy Court, S.D. Florida.

June 25, 1982.

Reggie David Sanger, Fort Lauderdale, Fla., for debtor-defendant.

Laurence A. Schroeder, c/o Walton, Lantaff, Schroeder & Carson, Miami, Fla., for plaintiff.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

Plaintiff Midas International Corporation brought this adversary action for injunctive relief for trademark infringement and unfair competition, for relief from the automatic stay of § 362 of the Bankruptcy Code, and for dismissal of the debtor's chapter 11 proceeding. The case was consolidated for trial with that of Midas International

Corporation vs. M & E Enterprises, Inc., Adversary Case No. 82–0358–BKC–JAG–A. Both the defendant here, Volpe, and M & E operated automotive service shops, primarily for the replacement of mufflers. Both were owned by the same persons and the premises for each were leased from the former owner. The defendant had a franchise agreement with the plaintiff and this litigation revolves around that agreement (Plaintiff's Composite Exhibit No. 2).

Plaintiff has cast its complaint primarily as an issue of trademark infringement. This begs the real issue, which is whether or not the franchise agreement was effectively terminated prior to bankruptcy. The defendant's use of the Midas trademark has been pursuant to the agreement, which it believes it still has rights under, and in conjunction with Midas products which plaintiff has sold to it.

Under the franchise agreement, defendant was to remit royalty payments for each month on the 10th of the succeeding month. These records were kept as a royalty account. The defendant also had a separate trade account with the plaintiff, to which was charged the cost of Midas products supplied to the defendant and through which it was credited when guaranteed replacements were made. However, most of the deliveries to the defendant in the past year were on a C.O.D. basis. Plaintiff's general credit manager testified that plaintiff occasionally permitted trade account credits to be applied to the royalty account.

Plaintiff's witnesses testified to a history of slow and late payments by the debtor on the royalty account during the previous year. As a result, a default notice was sent to the defendant on April 24, 1981. The defaults were not cured in a timely manner and a Notice of Termination was sent on July 21, 1981. Apparently the debtor satisfied Midas at that time and was reinstated. Another Notice of Default was sent on October 20, 1981 and a Notice of Termination on December 10, 1981. Once again, there apparently was a reinstatement. Additional Notices of Default were sent on January 6, 1982, January 15, 1982, and February 18, 1982. On March 9, 1982, a Notice of Termination, effective April 1, 1982, was sent. On March 17, a second termination letter was sent, confirming that the debtor would be terminated despite any purported waiver by anyone in plaintiff's credit department. All of these letters, together with return receipt forms, are included in Plaintiff's Composite Exhibit No. 2. At the time of the final termination letter, the October, November and December 1981 and the January, February and March, 1982 royalty payments were unpaid. (In some cases, checks had been tendered but were returned for insufficient funds.)

Article 8.2(c) of the franchise agreement, provides:

> In the event Franchisee has been given written notice of default by Midas three times within any period of twelve consecutive months pursuant to paragraphs (a) and/or (b) above, and in each of such prior instances Franchisee has cured the default within the time permitted, then in the event Franchisee again fails, within said twelve-month period, to perform any obligation referred to in paragraph (a) or (b), Midas may at any time thereafter terminate this Agreement forthwith, without giving prior notice of such default and without affording Franchisee any period in which to cure such default, by giving written notice of such termination to Franchisee.

■ The defendant contends that plaintiff is estopped from now terminating when it had previously permitted defendant to cure, or had waived previous termination notices. (Upon notice of termination, the debtor tendered cashier's checks which were not accepted.) Although the terms of the default letters do not give any hint that Midas might terminate despite timely curing of default, the language of the contract, which the defendant is bound by, is quite clear. Because of the prior notices of default, Midas had the right to terminate the agreement without a preliminary warning in the notice. Similarly, there was insufficient evidence of any other representations or actions by the plaintiff which would estop it from terminating the agreement.

Defendant also argues that it would not have been in default in certain of the instances, had amounts been properly credited, and impliedly argues that, because the default notices were incorrect, they cannot form the basis for the termination notice pursuant to Article 8.2(c).

 Plaintiff put into evidence statements of the current balances in the trade and royalty accounts (Plaintiff's Composite Exhibits 3 and 4 respectively), with attached summaries which the plaintiff prepared for trial from its records. Defendant put into evidence the monthly statements it received from Midas on the trade account. (Defendant's Composite Exhibit A). The manner of preparation and presentation of these statements makes it difficult to analyze them or to determine the balance at any given day, and it is difficult to reconcile the statements with each other and with some of the testimony. The court does observe that, as to the first default notice, for example, plaintiff's records show that the March, 1981 royalty payment was credited to the debtor on April 17, 1981, exactly one week after it was due. However, the default letter, which was written another week later, on April 24, 1981, states that the March payment had not been made. Nevertheless, defendant subsequently was in default at many times, and it has not demonstrated through testimony or through the documents in evidence that the defaults would not have existed if payments had properly been credited. A sufficient number of valid default letters were sent to justify the termination notice which plaintiff is now relying on. Therefore, the termination must stand.

Since the franchise agreement was validly terminated prior to the filing of bankruptcy, there is nothing left for the court to resuscitate or protect. *In re. Benrus Watch Co., Inc.,* 13 B.R. 331, 4 C.B.C.2d 1401 (Bkrtcy.S.D.N.Y.1981); *In re. Beck,* 5 B.R. 169, 6 B.C.D. 1119 (Bkrtcy.Hawaii 1980); *Schokbeton Industries, Inc. v. Schockbeton Products Corp.,* 466 F.2d 171 (5th Cir. 1972). Therefore, the ability of the debtor to reorganize and the value of the franchise to a reorganization are not relevant to a determination of this adversary.

 There has been no showing of a likelihood that the debtor will continue to hold itself out as a Midas dealer or that it will sell other products, falsely representing them to be Midas products, once it has received a court ruling unfavorable to its position that it may continue to operate under the franchise agreement. However, an order enjoining defendants from so doing will not impose on it any greater limitations than a declaratory order. Therefore, an injunction against defendant will be entered.

A Final Judgment in accordance with these Findings and Conclusions will be entered this date.